**LITE, DePALMA, GREENBERG & RIVAS, LLC**
Bruce D. Greenberg
Jennifer Sarnelli
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
bgreenberg@ldgrlaw.com
jsarenlli@ldgrlaw.com
Telephone: (973) 623-3000

**BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.**
Andrew S. Friedman
Elaine A. Ryan
Kathryn A. Jann
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
afriedman@bffb.com
eryan@bffb.com
kjann@bffb.com
Telephone: (602) 274-1100

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SUSAN J. SHIRING, LCSW, on behalf of herself individually and all other similarly situated individuals,<br><br>        Plaintiff,<br><br>v.<br><br>CIGNA CORPORATION, CONNECTICUT GENERAL CORPORATION, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, CIGNA HEALTH CORPORATION, CIGNA BEHAVIORIAL HEALTH INC., and CIGNA DENTAL HEALTH INC.,<br><br>        Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><u>Demand for Jury Trial</u> |

# TABLE OF CONTENTS

I.  Nature of the Case ................................................................................. 1

II.  Jurisdiction and Venue ......................................................................... 4

III.  The Plaintiff ......................................................................................... 4

IV.  The Defendants ..................................................................................... 4

V.  Facts Common To All Counts .............................................................. 5

    A - In-Network vs. Out-of-Network ............................................. 5

    B - The Ingenix Database ............................................................. 6

    C - Investigation into the Ingenix databases ............................. 14

VI.  Plaintiff Susan J. Shiring, LCSW. ..................................................... 18

VII.  Class Allegations ................................................................................ 19

VIII.  Legal Claims ...................................................................................... 22

    Count One (Violation of ERISA § 502(A)(1)(B)) .......................... 22

    Count Two (Violations of RICO, 18 U.S.C. 1962(c)) ................... 23

    Count Three (Breach of Fiduciary Duties of Loyalty & Due
    Care In Violation of ERIS § 404) ..................................................... 32

    Count Four (Violations of § 664 of RICO) .................................... 34

IX.  Prayer for Relief ................................................................................. 43

X.  Jury Trial Demand .............................................................................. 45

For her complaint, Plaintiff SUSAN J. SHIRING, LCSW ("Plaintiff") brings this action both individually and on behalf of all non-MD health care providers who are not licensed medical doctors or doctors of osteopathy against Defendants CIGNA CORPORATION, CONNECTICUT GENERAL CORPORATION, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, CIGNA HEALTH CORPORATION, CIGNA BEHAVIORAL HEALTH INC., and CIGNA DENTAL HEALTH INC. (collectively, "CIGNA" or "Defendants"), and pursuant to her investigation, upon knowledge as to herself and her own acts and otherwise upon information and belief, for her Class Action Complaint alleges as follows:

## I.     NATURE OF THE CASE

1.     This is a class action seeking redress for CIGNA's unlawful practice of systematically underpaying "out-of-network" non-MD health care providers for their services. Patients covered under CIGNA's health plans (aka "insureds") have the option of using non-MD health care providers who are "in-network" or "out-of-network." In-network non-MD health care providers have agreed with CIGNA to accept pre-negotiated reimbursement rates as payment in full for their services. Out-of-network non-MD health care providers are not so limited and are entitled to be paid by CIGNA at the "usual, customary and reasonable" ("UCR") rate.

2.     The CIGNA companies are among the country's leading health care benefits companies, insuring and administering individual and commercial (employer sponsored) health benefits. CIGNA provides health and dental benefits, mostly through employer-sponsored health benefit plans, in all 50 states to more than 25 million individuals.

3.     CIGNA uses or used claims-support databases created by Ingenix, Inc., a

wholly owned subsidiary of UnitedHealthcare Group, Inc., one of the nation's largest insurers, to calculate the UCR rate for out-of-network providers. An investigation by the New York Attorney General, Andrew Cuomo, revealed that Ingenix's databases are intentionally skewed to lower the UCR rates through, *inter alia*, faulty data collected, poor pooling procedures and the lack of audits to ensure the integrity of the data collected from CIGNA and other insurers. Cuomo's investigation concluded that use of UCR rates obtained through Ingenix's databases resulted in underpayments of as much as 10-28%.

4.      Following on the heels of the attorney general investigation, on March 26 and 31, 2009, Senator John D. Rockefeller, IV, presided over Senate hearings investigating health insurers' out-of-network rate practices. The Senate weighed evidence that health insurers had routinely underpaid their insureds for out-of-network health care. The chief executives of UnitedHealthcare and Ingenix were questioned about the quality of Ingenix's databases and, specifically, about "data laundering" – the selective use of doctors' bills to determine out-of-network payments. Senator Rockefeller characterized the insurers' out-of-network rate practices as "outright fraud" and said the hearings were meant to determine whether more federal oversight of insurers is necessary to protect consumers.

5.      Most of the Ingenix data used by insurers to determine UCR amounts was supplied by Ingenix's parent company and Aetna. These insurers recently agreed to pay $70 million to set up a new database for determining UCR reimbursement amounts. Cigna was also investigated by the New York Attorney General and agreed to make a $10 million contribution to the development of the new database program

and to stop using the Ingenix databases. The new database will be owned and operated by a non-profit organization to eliminate insurance company conflicts of interest. However, the creation of this new database does not fix the years of underpayments that CIGNA already has made to non-MD health care providers. As a result of CIGNA's use of Ingenix to set UCR rates, out-of-network non-MD health care providers have been short-changed millions of dollars that they were entitled to be and should have been paid.

6. In addition, CIGNA's systematic underpayment of out-of-network non-MD health care providers resulting from its reliance on Ingenix and other faulty data had the intended effect of discouraging its insureds from choosing to use of out-of-network providers because, *inter alia*, by improperly lowering out-of-network reimbursements CIGNA thereby increased unpaid amounts for which its insureds would be financially responsible. CIGNA's serial underpayment of out-of-network UCR amounts also pressured non-MD health care providers who otherwise would have remained out-of-network to join CIGNA's network of non-MD health care providers and accept CIGNA's discounted contract reimbursement rates.

7. Plaintiff was an out-of-network Licensed Clinical Social Worker who was both underpaid and lost potential patients by CIGNA's use of Ingenix's databases to process her claims. She brings this class action on behalf of all out-of-network non-MD health care providers practicing in the United States who are not licensed medical doctors and who, during the applicable limitations period, submitted claims for payment of their health care services to CIGNA and were paid less than the amount submitted on their claim (collectively, the "Class" or "Class Members").

8. Plaintiff alleges that CIGNA's wrongful underpayments violated its legal obligations to her and the Class, as assignees and beneficiaries of their patients' benefits, under the Employee Retirement Insurance Security Act of 1974 ("ERISA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the Sherman Antitrust Act, as described herein.

9. Plaintiff seeks declaratory, injunctive, and restitutionary relief, damages and treble damages, and other remedies for CIGNA's unlawful conduct.

## II. JURISDICTION AND VENUE

10. ERISA governs the rights and duties of insurance companies and CIGNA's insureds of employer sponsored health care plans. 29 U.S.C. § 1132. This Court has jurisdiction of those claims under 29 U.S.C. § 1132(e). Subject matter jurisdiction also exists under both 28 U.S.C. § 1331 and §1332(d).

11. Venue is appropriately established in this District under 29 U.S.C. § 1132(e)(2), 28 U.S.C. § 1391, § 1965 of RICO, and 18 U.S.C. § 1965, because CIGNA conducts a substantial amount of business in this District and insures and administers health plans both inside and outside of this District.

## III. THE PLAINTIFF

12. Plaintiff, Susan J. Shiring, LCSW, resides on Chevy Chase Avenue in Dallas, Texas. At all relevant times, Ms. Shiring was and is a Licensed Clinical Social Worker (LCSW) holding a master's degree in social work (MSW). Although Ms. Shiring became a participant in CIGNA's health plans in 2006, prior to that time, she did not participate in CIGNA's health plans and was therefore deemed an out-of-network provider for CIGNA.

# IV.   THE DEFENDANTS

13.   Defendant CIGNA Corporation is a Delaware corporation with executive offices located in Philadelphia, Pennsylvania.   CIGNA Corporation is the parent company of all of the other Defendants.

14.   Defendant Connecticut General Corporation ("Connecticut General") is a Connecticut company with its principal place of business in Hartford, Connecticut. Connecticut General is CIGNA Corporation's major health care benefits and insurance subsidiary.

15.   Defendant Connecticut General Life Insurance Company ("Connecticut General Life") is a Connecticut Corporation with its principal place of business in Bloomfield, Connecticut.   Connecticut General Life provides managed health care benefits, writes health insurance policies and is listed by CIGNA on certain EOBs and health care identification cards as an administrator of its health plans.   Connecticut General Life is a subsidiary of Connecticut General.

16.   Defendant CIGNA Health Corporation ("CIGNA Health") is a Delaware corporation with its principal place of business in Jersey City, New Jersey.   CIGNA Health provides managed health care benefits and insurance and is a subsidiary of Connecticut General.

17.   Defendant CIGNA Behavioral Health Inc. ("CIGNA Behavioral Health") is a Minnesota corporation with its principal place of business in Eden Prairie, Minnesota.   CIGNA Behavioral Health provides behavioral health care benefits and is a subsidiary of Connecticut General.

18.   CIGNA Dental Health Inc. ("CIGNA Dental Health") is a Florida

corporation with its principal place of business in Fort Lauderdale, Florida. CIGNA Dental Health provides dental health care benefits and is a subsidiary of Connecticut General.

19. Defendants CIGNA Corporation, Connecticut General Life, Connecticut General, CIGNA Health, CIGNA Behavior Health, and CIGNA Dental Health are collectively referred to in this complaint as "CIGNA," which includes all CIGNA owned or controlled subsidiaries with interrelated or intertwined activities. "CIGNA" and "CIGNA HealthCare" are brand and/or trade names used for the health benefit products and services provided by Defendants.

20. In terms of premiums and number of insureds, CIGNA, a managed care company, is one of the largest providers of health care benefits and health services in the country, including employer sponsored health benefit plans.

21. CIGNA is one of the largest publicly traded health service organizations in the United States, processing approximately 122 million medical claims in 2008 alone. CIGNA is licensed to do business in New Jersey. CIGNA also sells, offers, insures, underwrites, and/or administers health benefits, including those at issue in this litigation, in all 50 states, including New Jersey.

22. CIGNA issues Explanation of Benefits ("EOB"), Remittance Advices, and other communications identifying Connecticut General Life or "CIGNA" or "CIGNA HealthCare" as the responsible entities.

## V.     FACTS COMMON TO ALL COUNTS

### A.     *Out-of-Network Non-MD Health Care Providers.*

23. Non-MD health care providers can either enter into an agreement with

CIGNA, in which case they are deemed "in-network," or they can provide services to CIGNA's insureds without any contract with CIGNA governing that relationship, in which case they are deemed "out-of-network."

24.     Non-MD health care providers who are in-network have signed contracts with CIGNA to provide health care services to its insureds at reduced rates in exchange for access to CIGNA's patient base, among other things.   In-network providers receive reimbursement of eligible charges directly from CIGNA.   When visiting an in-network provider, insureds are only responsible for co-payments, co-insurance, and payment for non-covered items (if any) at the time of service.   CIGNA usually pays less money when its insureds use an in-network provider, because those providers have agreed to provide their services at a lower cost to CIGNA's insureds.

25.     Out-of-network providers are non-MD health care providers who do not have a contract to provide health care services to CIGNA's insureds.   Because no specific reimbursement rate has been agreed to by the provider, out-of-network providers are not required to accept reduced rates for their services and can instead charge any amount they choose.   Out-of-network providers may then collect their full charges directly from patients at the time of service or may agree to accept an assignment of benefits, which occurs when an insured authorizes their insurance company to remit payment directly to the health care provider for the covered services.   Out-of network providers are entitled to bill the patient for any amount exceeding the amount covered by insurance.

26.     While out-of-network providers may bill the retail cost of their services, CIGNA does not necessarily pay the total amount billed.   Rather, CIGNA pays on a

fee for service basis that is equal to the lesser of the out-of-network provider's billed charges or a percentage of the UCR amount as determined by CIGNA.[1]

27.   The UCR amount is supposedly determined based on a review of the prevailing charges made by peer physicians for a particular medical or health service by a specific type of physician within a specific community or geographical area. The UCR amount is the maximum amount CIGNA will consider eligible for reimbursement to out-of-network providers (the so-called "allowed charge"), and is typically determined by CIGNA through its use of the Ingenix databases, although occasionally by the use of Medicare data.

**B.     *The Ingenix Databases.***

28.   CIGNA primarily calculates UCR rates for out-of-network providers by using databases that are owned and operated by a third party, Ingenix, Inc. ("Ingenix"). Ingenix is owned by America's largest health insurance company, UnitedHealthcare Group. These databases are known as the Prevailing Healthcare Charges System ("PHCS"), which Ingenix purchased in 1997, and Medical Data Research ("MDR"), which Ingenix purchased in 1998 (collectively, "Ingenix databases").

29.   The PHCS database was produced and has been marketed to insurers, including CIGNA, since 1973. However, its prior owner, Health Insurance Association of America ("HIAA"), informed CIGNA and other data purchasers that it was not endorsing, approving, or recommending the use of any of its data for any particular purpose. In fact, HIAA released its data with a disclaimer that specifically

---

[1] While the language used to define UCR may differ somewhat across Aetna's various Evidences of Coverage, the meaning as interpreted and applied by Aetna is the same.

stated, in relevant part, that the data was being provided to members [*i.e.*, insurers such as CIGNA] for informational purposes only. HIAA disclaimed any endorsement, approval or recommendation of the data, or its use to determine "usual and customary" charges. Once Ingenix acquired PHCS from HIAA in 1998, it continued to use substantially the same disclaimer in its communications with insurers including CIGNA, as set forth in paragraph 26 below.

30. Ingenix produces two cycles of data a year, which include medical, surgical, anesthesia, and dental data as well as the HealthCare Financing Administration's common procedure coding system services ("HCPCS").

31. The Ingenix databases are purportedly designed to collect and report actual charge data by health care providers for out-of-network health care services from which UCR amounts can be determined. For some services, the Ingenix databases feature "derived data," which uses relative values and averages charges for a number of procedures in the same "bodily area" as the procedure for which a derived amount is calculated.

32. The Ingenix databases are based on charge data contributed to Ingenix by health plans, including UnitedHealthcare (the parent company of Ingenix), Aetna, CIGNA, and other insurance payors who also use the final published data to price out-of-network claims as UCR.

33. Certain data contributors, including CIGNA, send less-than-complete and/or extensively pre-edited charge data to Ingenix, skewing the data downward to the detriment of out-of-network providers like Plaintiff whose UCR rates are artificially lowered by insurers using the Ingenix databases. Ingenix was aware of the

pre-editing and other improper practices engaged in by its data contributor health plans. Nevertheless, Ingenix failed to audit its data contributor health plans or take other steps to ensure completeness and accuracy of their data. In addition, Ingenix itself also extensively edited this data, which further contributed to its invalidity and inaccuracy.

34.     Whenever CIGNA uses the Ingenix databases to determine UCR amounts, CIGNA relies on the Ingenix data alone and gives no consideration to the increased severity or complexity of a specific case, which is necessary for a proper determination of the UCR amount. CIGNA systematically failed to disclose this critical information to Plaintiff, the Class, its insureds and regulators.

35.     CIGNA also systematically failed to advise its insureds and out-of-network providers that the Ingenix data it used to establish UCR amounts is produced with the following disclaimer:

> The Ingenix data, whether charge data or conversion factor data, are provided to insureds for informational purposes only. Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data. There is neither a stated nor an implied 'reasonable and customary' charge (either actual or derived). . . . Any interpretation and/or use of the data by the subscriber is solely) and exclusively at the discretion of the subscriber.

36.     Even though Ingenix informed CIGNA and other data users that they cannot "represent" the Ingenix data other than as described in the disclaimer, CIGNA used and represented the Ingenix data inconsistently with the disclaimer as being an accurate method for determining UCR amounts.

37.     Throughout the Class Period, CIGNA used the Ingenix data as its primary basis for making its UCR determinations, even though CIGNA knew or should have

known that the data could not and should not have been used for that purpose and, as with the Medicare data, was not properly designed to determine UCR reimbursement amounts. CIGNA obtained the data from Ingenix, loaded the data onto its internal claims-processing platforms, accessed that data and resolved claims automatically based on that data, through auto-adjudication – an automated, paperless and human-less process.

38. CIGNA's claims processors simply entered certain claim information into their computers to access the Ingenix databases, which then displayed a dollar amount Ingenix calculated for each procedure code at the applicable percentage. CIGNA used this Ingenix amount as the UCR amount.

39. There are a number of inherent flaws in the Ingenix data that make it an invalid and inappropriate basis for setting UCR amounts, chief among them the data only includes four points: date of service, CPT Code, address where service was performed, and the amount of the provider's billed charges. In addition, the Ingenix database:

<blockquote>

(a)  Does not determine the numbers or types of providers in any geographic area;

(b)  Does not determine the actual types of procedures within a geographic area;

(c)  Collects charge data that is not representative of the actual number of procedures performed within a geographic area;

(d)  Does not collect sufficient data to enable its users to determine whether the data reflects the charges of providers with any particular degree of expertise or specialization;

(e)  Does not collect sufficient provider-specific data to enable its users to determine whether the charges are from one provider, from several providers, or from only a minority or specific subset of the providers in a geographic area;

(f)  Does not collect patient specific information such as age or

</blockquote>

medical history or condition;

(g) Does not ascertain the most common charge for the same service or comparable service or supply;

(h) Does not determine the place of service or type of facility;

(i) Does not collect sufficient data to enable it or its users to determine an appropriate medical market for comparing like charges;

(j) Combines zip codes inappropriately, and uses zip codes instead of appropriate health care markets;

(k) Fails to compare procedures that use the same or similar resources (and other costs) to the provider but, rather, indiscriminately combines all provider charges by procedure code without regard to such factors;

(l) Fails to compare procedures of the same or similar complexity by, among other things, failing to record or account for CPT code modifiers;

(m) Does not use an appropriate statistical methodology;

(n) Does not properly consider charging protocols and billing practices generally accepted by the health care community or specialty groups;

(o) Does not properly consider health care costs in setting geographic areas;

(p) Lacks quality control, such as basic auditing, to ensure the validity, completeness, representativeness, and authenticity of the data submitted;

(q) Is subject to pre-editing by data contributors;

(r) Is subject to additional editing by Ingenix;

(s) Reports charges that are systemically skewed downward;

(t) Uses relative values and conversion factors to derive inappropriate UCR amounts;

(u) Uses a methodology that does not comply with CIGNA's contractual definition of UCR;

(v) Purports to be confidential and/or proprietary, which prevents access to, and scrutiny of, the data by non-MD health care providers, insureds or their employers;

(w) Cannot determine from its pooled data the number or percentage of providers furnishing billed charge data;

(x) Fails to consider the provider's usual charge;

(y) Lacks the ability to incorporate into its analysis the provider's licensure, specialty training, or experience;

(z) Does not account for the complexity of a patient's specific treatment or condition or the degree of skill or expertise needed for the particular service;

(aa) Fails to collect data regarding the range of services or supplies provided by a facility; and

(bb) Does not collect data regarding rates based on cost factors or the cost of providing the same or similar service or supply or the prevailing charge level for any provider or service.

40. These and other flaws render CIGNA's use of Ingenix data invalid and unlawful for determining UCR amounts. CIGNA knew or should have known of these flaws in the Ingenix data. CIGNA recognized the overwhelming problems involved with using Ingenix's databases to calculate UCR amounts due to Ingenix's failure to collect or utilize data other than the four data points. CIGNA and Ingenix (and HIAA) discussed expanding the data to include more data points. Ingenix attempted to collect additional data, but was unable to get additional data from all of its data contributors, and did not incorporate the data it did receive into its databases.

41. Nevertheless, CIGNA continued to use Ingenix's faulty databases, without advising its insureds or providers of the many flaws in the Ingenix data, including its use of only four data points.

42. In using the Ingenix data, CIGNA elevated its own financial self-interest over the best interests of its insureds and their providers. When deciding a claim for out-of-network benefits, CIGNA operates under a conflict of interest. First, every dollar paid to an out-of-network provider is one less dollar for CIGNA, so it systematically and without justification is encouraged to and does reduce the value of out-of-network benefits through the use of Ingenix products. Second, CIGNA's core

product is its network of non-MD health care providers, which it attempts to preserve by discouraging the use of out-of-network providers by systematically and without justification reducing the amount it will pay for out-of-network benefits by using Ingenix to lower the UCR amounts for out-of-network providers. In other words, the more an insured has to pay to go to an out-of-network provider over an in-network provider, the more likely that insured is to stay in-network.

43. During the Class Period, CIGNA improperly used the Ingenix databases to set reimbursement rates for out-of-network claims in the following ways, resulting in adverse benefit determinations that damaged Plaintiff and the Class:

(a) By using Ingenix data from a different geographic area if there was no Ingenix provider charge data available for the geographic area where a particular service was rendered to an insured.

(b) By using outdated versions of the Ingenix databases to determine UCR amounts for its insureds.

(c) By setting UCR amounts for out-of-network claims knowing that some Ingenix data contributors, including CIGNA, deleted "high" provider charges for health care services from the data they submitted to Ingenix for use in the Ingenix databases.

(d) By setting UCR amounts for out-of-network claims knowing that Ingenix further had manipulated its databases by deleting (i) additional valid "high" charges by non-MD health care providers and (ii) significantly more "high" charges than "low" charges.

(e) By setting UCR amounts for out-of-network claims knowing that Ingenix had deleted from its databases provider charges that contained health care claim coding "modifiers," which indicate procedures or services with special complications that often warrant a higher UCR amount.

(f) By setting UCR amounts for out-of-network claims knowing that Ingenix failed to audit the data it received from data contributor health plans to ensure that they had submitted all appropriate data and had not improperly reported negotiated or discounted rates that providers charged for health care services rather than charges

14

actually billed by providers.

(g)    By setting UCR amounts for out-of-network claims knowing that Ingenix used a deficient methodology to "derive" additional provider charges in the databases beyond the charges actually reported by Ingenix data contributor health plans to Ingenix. Ingenix's use of defective data to "derive" such additional provider charges caused the resulting rates to be defective and improper for use in setting reimbursements for health care services.

44.    During this period, CIGNA also, to a lesser extent, set UCR rates based on Medicare rate data. As with the Ingenix databases, this Medicare data was not designed to and could not establish valid UCR amounts. Such rates are therefore not a proper or legitimate method for reducing Plaintiff's and the Class Members' claimed amounts.

45.    By systematically and typically making UCR determinations without compliant and valid data to substantiate its determinations, CIGNA has breached its obligation to reimburse Plaintiff and the Class for the out-of-network services they provide to CIGNA's insureds. Accordingly, all past UCR determinations based on such noncompliant data should be overturned.

46.    As a further means of reducing out-of-network reimbursement to out-of-network providers during the Class Period, CIGNA knowingly used outdated or "old" Ingenix data to price out-of-network claims.

47.    CIGNA also sometimes did not use the Ingenix data if that data did not report a certain number of charges for a given CPT code, instead applying its own claims platform to determine the UCR amount if the number of charges in the Ingenix data triggered the use of its default formula. At times, these platforms utilized out of date data and data even more flawed than ordinary Ingenix data to determine the UCR

amount.

48.  Additionally, if the Ingenix data failed to provide the minimum number of data points, CIGNA's claim systems applied CIGNA's own "default" formulas to calculate the UCR during the Class Period.

49.  CIGNA did not disclose that it used "default" formulas to establish UCR amounts during the Class Period.  In fact, CIGNA insureds as well as Plaintiff and the Class had no way of knowing that a "default" formula had been used to price UCR, nor the method inherent in such default formula.  Indeed, CIGNA referred to one of its default formulas as a "behind-the-scenes" program., and in September 2001, CIGNA personnel described a "behind-the-scenes" program to calculate UCR as follows:

> Yes, you can say that if we receive less than 10 reportings [charges] on a SURGICAL procedure, a behind-the-scenes-programs [sic] calculates the U&C amount by averaging the reportings for all zips associated with that procedure that have more than 4 reportings. If there are less than 4 reportings for all zips associated with the procedure, then the procedure does not get updated at all.

> As for how it gets different amounts for the different zips, Step 5 is where that happens. Factors are calculated for the mean and each of the percentiles for each zip area. Then, Step 6 multiplies those factor amounts by the Relative Value for the procedure to get the amounts that are updated to the database for each zip.

> Please let me know if this helps. I know that it is 'clear as mud' and I will try to get you a more 'user friendly' explanation of this process as soon as I can get around to it.

50.  CIGNA also fails to advise health care providers, like Plaintiff and the Class, when it has used a "default" formula or other "behind-the-scenes" program to price UCR, which violate its obligations to both its insureds and the health care providers.

51.    During the Class Period, CIGNA also uses or used a claims platforms that applied different rounding rules for establishing UCR rates, which resulted in CIGNA calculating inconsistent UCR amounts despite the fact that the calculations were made for the same date, same procedure in the same geographic area.

52.    By using Ingenix data and other improper out-of-network pricing methods to reduce reimbursements during the Class Period, CIGNA violated, and continues to violate, its legal obligations to Plaintiff and the Class.

53.    CIGNA failed to disclose and misrepresented to Plaintiff and the Class material information regarding out-of-network determinations in violation of ERISA, RICO, the Sherman Act, and federal common law.  By not providing Plaintiff and the Class an accurate explanation of the basis for their UCR or other out-of-network determinations, CIGNA failed to provide the "full and fair review" required by ERISA. CIGNA has also illegally agreed with Ingenix that neither will disclose the Ingenix database information so that they can conceal the defects from insureds and providers alike.

54.    CIGNA violated various fiduciary, statutory, and common law duties to Plaintiff and the Class by not providing a full and fair appeals process and the underlying data on which they purportedly relied on to deny their assigned benefits, and by failing to make decisions untainted by their own self-interest.

**C.    *Investigations into the Ingenix databases.***

55.    A recently concluded investigation of Ingenix's databases by New York Attorney General, Andrew Cuomo, confirmed that "the Ingenix databases in fact under-reimburse consumers."  January 13, 2009 New York Attorney General Health

Care Report, "THE CONSUMER REIMBURSEMENT SYSTEM IS CODE BLUE," available at: http://www.oag.state.ny.us/bureaus/health_care/HIT2/pdfs/FINALHITIngenix ReportJan. 13, 20 2009.pdf.

56.  According to the Attorney General's report, an analysis of the New York market showed that insurers that used Ingenix and other similar methods to determine UCR "systematically under-reimburse New Yorkers for doctor's office visits." *Id.*

57.  "When extrapolated across the State and the country, it is fair to say that the Ingenix databases have caused Americans to be under-reimbursed to the tune of at least hundreds of millions of dollars over the past ten years." *Id.*  Non-MD health care providers, like Plaintiff and the Class, and the insureds, of course, are the primary victims of this under reimbursement scheme.

58.  Moreover, CIGNA's continuous underpayment of out-of-network claims has interfered with Plaintiff's and the Class' relationships with their patients, the insureds.  Mr. Cuomo agreed:

> The responsible consumer reads the plan documents and sees a thicket of words. One term seems intelligible: the "usual and customary rate" of a similar physician for a similar service in a similar area. That sounds reasonable. The consumer makes the leap out-of-network and submits the bill to the insurer, only to be told the consumer will not be fully reimbursed because the doctor's charge exceeded the usual and customary rate.  The fog of ignorance continues, thanks to the insurer.  The physician-patient relationship is undermined, as the physician has been branded a charlatan whose bills are inflated. No one's interests here are advanced, except perhaps when next time, the consumer decides to stay in network for fear of what bills may accrue for out-of-network care. The interests advanced in that event are those of the insurer, whether by accident or design.

*Id.*

59. In discussing where the blame for this under-reimbursement scheme should lie, the New York Attorney General explained: "[T]he fault cannot be laid on Ingenix alone. All industry members have benefited unfairly at the expense of consumers over the past ten years, and they continue to benefit unfairly from a rigged system day after day." *Id.* CIGNA, as a significant beneficiary of the Ingenix database, should therefore be held accountable for its use of the database to under-reimburse Plaintiff and the Class.

60. Simultaneous with or soon after the release of the New York Attorney General's findings, UnitedHealthcare, the owner of the Ingenix database, and 10 other insurers settled the New York Attorney General's, and the American Medical Association's ("AMA") and others' claims concerning insurers' use of Ingenix's databases to determine UCR amounts. As part of the attorney general settlements, CIGNA agreed to pay $10 million dollars toward the creation of an independent non-profit organization to develop, own and operate a new database to be used for UCR determinations, plus $60,000 toward the Attorney General's investigative costs. This new database will be designed to replace the Ingenix databases. CIGNA further promised to stop using the Ingenix database to set UCR amounts.

61. Upon information and belief, UnitedHealthcare also agreed to pay approximately $350 million to settle claims brought by a class of consumers and providers, the AMA and others, related to the underpayment of UCR amounts for out-of-network health care services.

62. Upon information and belief, CIGNA is also under investigation by the Connecticut Attorney General's office related to CIGNA's payment of certain out-of-

network claims.

63.   Upon information and belief, other insurers remain under investigation by the New York Attorney General for similar conduct.

64.   Congress also is actively investigating the use of Ingenix's databases in setting UCR amounts.  Recently, the Senate Committee on Commerce, Science, and Transportation held full committee hearings on "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Paid For?"  The Committee held two such hearings, the first on March 26 and the second on March 31, 2009, examining how the health insurance industry reimburses consumers for out-of-network health care services; specifically, how the industry calculates the UCR rates for out-of-network non-MD health care providers.  The statements and archived webcast are available at http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_ID=4edbd03a-bf22-4783-87db-dfd57d980123 (March 26, 2009 Hearing) and http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_ID=63b0f558-ec43-4ab8-82f0-070bcc699e38 (March 31, 2009 Hearing) (SR-253).

65.   At the March 31, 2009 hearing, Senator and Committee Chairman John D. Rockefeller, IV, speaking for the majority of the Senate Committee, explained why they believed the insurance industry's practices were "deceptive."  Mr. Rockefeller noted that more than 100 million Americans paid for health insurance that would give "them the option of going outside of their provider networks for care," but that the insurance companies were not living up to their end of the bargain:

> Let's be very clear about this.  The insurers aren't letting their policyholders see non-network doctors out of the goodness of their hearts.  Consumers are paying for this

option - through higher premiums and higher cost sharing. There are many reasons American consumers decide to pay the extra money for health insurance with an out-of-network option. One New York consumer we heard from last week, Dr. Mary Jerome, said she paid extra for the "peace of mind" that she could get the best care available when she really needed it.

What we learned at our first hearing was that while consumers held up their side of the bargain, the insurers did not. The insurance industry promised to base their out-of-network payments on what they call the "usual, customary, and reasonable" cost of medical care in a particular area. Thanks to the New York investigation and other lawsuits, we now know that the insurance companies were not delivering what they promised.

66. Senator Rockefeller specifically addressed the New York Attorney General's findings as to the insurance industry's use of Ingenix's databases to pay far less than the UCR amounts:

In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates. A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates. Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers. For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying. The source of the skewed data was Mr. Slavitt's company, Ingenix.

67. In light of the insurance industry's fraudulent use of Ingenix's databases in setting UCR rates, the Senate Committee is currently evaluating whether more federal oversight and regulation of the insurance industry is necessary. For now, however, the only avenue of redress for insureds and their health care providers, such as Plaintiff and the Class, is through the courts.

## VI. PLAINTIFF SUSAN SHIRING, LCSW

68. Plaintiff, Susan Shiring, LCSW, is a Licensed Clinical Social Worker who resides and works in Richardson, Texas. Ms. Shiring has obtained assignments of

benefit payment rights from insureds covered under CIGNA employer sponsored and non-employer sponsored health care plans, and for such plans where CIGNA functions as a plan administrator under ERISA. Ms. Shiring asserts claims as a member of the Class and Sub-Class for unpaid UCR amounts due her under these assigned claims.

69. Prior to going in-network with CIGNA in 2006, Ms. Shiring was an out-of-network health care provider to insureds covered by CIGNA's plans, and remained free to charge her patients her actual charges for medical services rendered. During that time, Ms. Shiring had no direct contractual relationship with CIGNA. Her experience with CIGNA was typical of other Class Members' experiences during the Class Period.

70. Because she was not in CIGNA's network of preferred providers, Ms. Shiring, as with other Class Members, typically obtained a claim assignment from her patients, through which she was paid directly by CIGNA for providing health care to its insureds. These claim assignments did not alter the legal relationship between CIGNA and its insureds, but rather provided the convenience of allowing its insureds to obtain needed health care on the implicit promise of later payment by CIGNA.

71. The assignment of benefit forms that Ms. Shiring and Class Members obtain from their CIGNA patients are security for future payment by CIGNA and direct CIGNA, as the patient's insurer, to pay the benefit claim direct to the out-of-network health care provider. Ms. Shiring could and did check claim coverage and obtain pre-authorization from CIGNA before performing services for CIGNA's insureds, but as with other Class Members, Ms. Shiring was not told CIGNA's

intended UCR reimbursement amount. Payment was unknown and frequently not automatic – unlike the services CIGNA has obtained for its insureds.

72. Ms. Shiring, like other Class Members, submitted her claims to CIGNA using standardized procedural codes such as CPT Codes, HCPCS (Healthcare Common Procedure Coding System) Codes, and modifiers, as needed, on a HCFA form 1500 (n/k/a, CMS 1500). These claims were submitted to CIGNA either in paper form or electronically and may or may not have been immediately processed by an electronic clearinghouse before reaching CIGNA. Ms. Shiring could submit larger claims to CIGNA on paper using the U.S. Mail.

73. Ms. Shiring receives EOBs from CIGNA indicating that her bills and her patients' claims were processed and/or administered by Connecticut General Life. When she was out-of-network, for example, Ms. Shiring billed CIGNA $100.00 for her services for Procedure Code 90806, but Connecticut General Life did not pay her $100.00, but rather reduced the amount to only $71.50 on the false premise that it represented the UCR amount.

74. With respect to the UCR reductions CIGNA imposed on Ms. Shiring, any exhaustion of administrative remedies with respect to the UCR determination would be futile, because CIGNA, as a matter of policy, refuses to alter or reprocess claims that have been processed pursuant to the Ingenix database. Alternatively, Ms. Shiring should be deemed to have exhausted any claims that otherwise were not exhausted, due to CIGNA's inadequate disclosure concerning grievance procedures and its violation of ERISA and the applicable ERISA regulations.

# VII.  CLASS ALLEGATIONS

75.  Plaintiff brings this action on behalf of herself and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure. The requirements of subparts 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure are met.

76.  Plaintiff brings this action on behalf of the following class:

> All out-of-network non-MD health care providers, who are not licensed medical doctors or doctors of osetopathy, practicing in the United States, and who, during the Class Period, submitted claims to CIGNA for payment of their health care services to CIGNA's insureds, and were paid less than the amount submitted on their claims, hereinafter collectively referred to as the "Class" or "Class Members."

77.  Plaintiff also brings this action on behalf of an ERISA sub-class defined as follows:

> All out-of-network health care providers, who are not licensed medical doctors or doctors of osteopathy, practicing in the United States, and who, during the Class Period, submitted claims to CIGNA for payment of their health care services to CIGNA's insureds under a group health plan subject to ERISA that was insured or administered by CIGNA, and were paid less than the amount submitted on their claims, hereinafter collectively referred to as the "Sub-Class" or "Sub-Class Members."

78.  The non-MD health care providers include chiropractors, podiatrists, physical therapists, psychologists, optometrists, and other providers who are not licensed physicians.

79.  Membership in the Class is so numerous that joinder of all members is impracticable.  Although the number of Class Members and their names are presently unknown, this information but can be readily determined from CIGNA's records. Upon information and belief, the Class includes thousands of out-of-network

providers nationwide. Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied.

80. There are numerous and substantial questions of law and fact common to all Class Members that control this litigation and predominate over any individual issues. Common questions of law and fact include, but are not limited to:

- Whether CIGNA correctly calculated out-of-network UCR rates when it used Ingenix;
- Whether CIGNA's use of the Ingenix database to calculate out-of-network UCR reimbursement rates is unlawful;
- Whether CIGNA's failure to properly disclose its out-of-network pricing methodology in its EOBs, as well as its failure to disclose the numerous flaws in the Ingenix databases it used to calculate UCR rates is unlawful;
- Whether CIGNA engaged in racketeering;
- Whether CIGNA engaged in anti-competitive conduct;
- Whether Plaintiff and the Class have been damaged;
- The proper method for calculating the damages suffered by Plaintiff and the Class; and
- Whether Plaintiff and the members of the Class are entitled to declaratory, injunctive and/or other equitable relief.

81. Plaintiff is a member of the Class and will fairly and adequately protect the interests of the members of the Class, is committed to the vigorous prosecution of this action, has retained counsel competent and experienced in class action, RICO and ERISA litigation and has no interests antagonistic to or in conflict with those of the Class or Sub-Class. For these reasons, Plaintiff is an adequate Class representative.

82. Plaintiff's claims are typical of the Class Members' claims, and are based on and arise out of a uniform pattern or practice as described above. If litigated individually, the claims of each Class Member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the

same relief.  CIGNA's actions are therefore generally applicable to the Class as a whole, and Plaintiff seeks equitable remedies with respect to the Class as a whole, within the meaning of Fed. R. Civ. P. 23(b)(2).

83.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.  Furthermore, the damages suffered by individual Class Members may be relatively small in comparison with the expense and burden associated with individual litigation, which make it impossible for Class Members to individually redress the harm done to them.  Proceeding as a class action will permit an orderly and expeditious administration of the claims of Class Members, will foster economies of time, effort and expense and will ensure uniformity of decisions.   Then, once CIGNA's liability is established, the Court and a jury can determine the claims of each member of the Class.   And, given the uniform policies and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

## VIII.  LEGAL CLAIMS

### COUNT ONE

### (Violation of ERISA § 502(A)(1)(B))

84.  Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

85.  This claim is asserted by Plaintiff on her own behalf and on behalf of the Sub-Class Members.

86.  Plaintiff and the Sub-Class have standing to pursue these claims because they are the assignees of their patients' out-of-network CIGNA benefits claims.

87. During the Class Period, CIGNA breached its plan provisions for benefits by underpaying UCR and other out-of-network reimbursement amounts in ERISA health care plans to Plaintiff and the Sub-Class in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

88. Defendants' breaches included, among other things, the misuse of the Ingenix database and other improper methods such as using Medicare data to calculate UCR amounts paid to out-of-network providers for health care services.

89. Under the terms of its health plans, CIGNA administers benefits and is a fiduciary.

90. In certain self-insured plans (aka Administrative Services Only or "ASO"), CIGNA makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") concerning benefits.

91. Where CIGNA acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, CIGNA is liable for underpaid benefits to Plaintiff and the Sub-Class in both fully insured and ASO ERISA health plans.

92. Pursuant to 29 U.S.C. § 1132(a)(l)(B), Plaintiff and the Sub-Class are entitled to recovery for unpaid benefits and declaratory relief relating to CIGNA's violation of the terms of its health care plans.

## COUNT TWO

### (Violations of RICO, 18 U.S.C. 1962(c))

93. Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

94.    This claim is asserted by Plaintiff on her own behalf and on behalf of the Class Members.

95.    Plaintiff and the Class have standing to pursue this claim as assignees of their patients' out-of-network CIGNA benefits and as third party beneficiaries of their patients' out-of-network CIGNA benefits.

96.    At all relevant times, CIGNA was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

97.    At all relevant times, and as described in this Complaint, CIGNA carried out its underpayment scheme to defraud Plaintiff and the Class in connection with the conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of CIGNA and Ingenix (the "Enterprise").

98.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

99.    As described herein, the Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which CIGNA has engaged.  In addition, the members of the Enterprise function as a structured and continuous unit, and performed roles consistent with this structure. The members of the Enterprise performed certain legitimate and lawful activities that are not being challenged in this Complaint, including the provision of health insurance and plan and claims administration services by CIGNA, which was done for many claims lawfully and without resort to unlawful practices. However, the creation, use and dissemination of invalid data for use in making UCR determinations was not lawful or legitimate.  In addition to the legitimate activities carried out by the

members of the Enterprise, its members used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this Complaint including, but not limited to, the intentional underpayment of benefits to Plaintiff and the Class resulting from CIGNA's use of flawed and invalid data for its UCR determinations.

100. The purpose of the Enterprise was to create a means by which CIGNA could reduce payments to Plaintiff and the Class for out-of-network services through the use of flawed and invalid data that could not easily be challenged. The Enterprise created the Ingenix database which appeared to be a valid database that reported actual charge data when, in fact, it was comprised of invalid and flawed data. Through their roles in the Enterprise, Ingenix directly benefited from the licensing fees it earned from the sale of the Ingenix databases and indirectly through the monies saved by UnitedHealthcare, its parent corporation. CIGNA benefited by reducing the amount of benefits it paid to Plaintiff and the Class for their out-of-network services through the use of the Ingenix database for its UCR determinations.

101. As alleged herein, although Ingenix issues a disclaimer to the users of the Ingenix databases, CIGNA continued to use the Ingenix databases in a manner directly at odds with the disclaimer. Ingenix knew that its data users were using the Ingenix databases improperly to make UCR determinations but failed to stop it. At the same time it was issuing a disclaimer in a misguided effort to provide itself (and UnitedHealthcare) with legal protection, Ingenix also was promoting the Ingenix databases as a cost-saving mechanism for those insurers (such as CIGNA) who used and relied upon it in making UCR determinations. In fact, Ingenix provided extensive "litigation support" to its data users, including vouching for data used to price their

UCR amounts. Ingenix employed staff to assist data users, including testifying in court, testifying in depositions, supplying documentation and otherwise bolstering the users' use of Ingenix data to price UCR. Thus, Ingenix ignored its own disclaimer, as did its users, despite the fact that the disclaimer correctly stated that the Ingenix database could ***not*** be used as a basis for making UCR determinations.

102. Ingenix and CIGNA knew that the UCR data was invalid because, *inter alia*, Ingenix only used the four basic data points discussed above to produce the final Ingenix database. Nonetheless, CIGNA continued to send the four data points to Ingenix and Ingenix continued to use the four data points to create the invalid Ingenix database which CIGNA used to under price UCR amounts.

103. Ingenix not only sought and accepted CIGNA's incomplete data, but it continued to provide a significant database discount to CIGNA. Ingenix also provided "litigation support" for UCR pricing determinations made by CIGNA using the Ingenix data. And, Ingenix failed to conduct any audits or reviews of the data it received from data contributors, including CIGNA. These actions were done in furtherance of Ingenix's effort to understate UCR amounts for the benefit of the CIGNA-Ingenix Enterprise.

104. Defendants' submission of data to Ingenix benefited Ingenix, and users of the Ingenix databases, including CIGNA.

105. Ingenix and CIGNA knew that the Ingenix databases were being used without Plaintiff or the Class ever being informed of the disclaimer or the inherent flaws in the Ingenix databases. For example, CIGNA falsely reported to Plaintiff and Class Members, via U.S. mail and interstate wire communications, that its reductions

in amounts paid for out-of-network services were based on UCR amounts when, in fact, the reductions were based on flawed and invalid numbers obtained from the Ingenix databases that substantially underreported UCR amounts.

106. During the Class Period, CIGNA participated in the conduct of the Enterprise to shift the costs of medical treatment from CIGNA to its insureds and therefore to Plaintiff and the Class, to reduce CIGNA's UCR payments and to create an appearance of legitimacy for its out-of-network benefit reductions. Using U.S. mail and interstate wire facilities, CIGNA provided false and misleading information to Plaintiff and the Class to convert those withheld funds for the Enterprise's own direct and indirect financial gain, and to discourage its insureds from using out-of-network non-MD health care providers. Because CIGNA saves money when services are provided by in-network non-MD providers, the operations of the Enterprise saved CIGNA money at the expense of non-MD providers like Plaintiff and the Class who were out-of-network. In turn, the Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by CIGNA and other users of the Ingenix databases, which would not have been obtained without entry into the Enterprise and was, in addition to the conduct of CIGNA alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

107. CIGNA, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for out-of-network services, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in

violation of 18 U.S.C. § 1343. Such predicate acts include the following:

> (a) mailing, causing to be mailed and/or knowingly agreeing to the mailing of various materials and information including, but not limited to, letters regarding preauthorization approval(s) and/or appeals and materially false and misleading UCR determinations, EOBs and remittance advices for the purpose of saving CIGNA money at the expense of Plaintiff and the Class, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

> (b) transmitting, causing to be transmitted and/or knowingly agreeing to the transmittal of various materials and information including, but not limited to, preauthorization approvals; materially false UCR determinations and related explanation of such determinations, by means of telephone, facsimile and the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

108. In furtherance of its scheme to reduce out-of-network provider benefits below the level it was otherwise contractually required to pay, using the U.S. mail and/or interstate wire facilities, CIGNA also submitted fraudulent certifications to Ingenix concerning its data. CIGNA falsely attested to the accuracy of the data it submitted to Ingenix's databases despite the fact that it maintained internal policies prohibiting substantial data from being included in its submission to Ingenix. The impact of CIGNA's data manipulation was to lower the amount of the reported charges so as to reduce the ultimate numbers that Ingenix would report and which CIGNA would use for making its UCR determinations. This information was material and was withheld by CIGNA from Plaintiff and the Class.

109. Aenta used the U.S. Mail to send EOBs to Plaintiff and the Class that showed UCR benefit reductions but did not sufficiently disclose the basis for Aenta's exclusion or reduction of charges, which prevented Plaintiff and the Class from learning the information needed to challenge or successfully appeal CIGNA's UCR

amount determinations.  CIGNA concealed the identity of the database, type of data or other methodology upon which it relied in determining UCR amounts.  CIGNA also failed to provide other information required under ERISA.

110. Aenta also used the U.S. Mail to send Plaintiff and the Class intentionally incomplete and misleading correspondence denying or reducing their claims and appeals, which again failed to identify the Ingenix databases as the basis for those denials.

111. CIGNA directs (on its EOBs) insureds and providers to call its toll free telephone number if they have questions about the claim at issue.  CIGNA also maintains a public website wherein it fraudulently and misleadingly represented to CIGNA's insureds and providers that it made UCR determinations based on the prevailing charges of what other providers charged for similar services.  CIGNA's website further misrepresented that CIGNA would consider factors that it, in fact, does not consider, such as the provider's specialty and, that it will consider the prevailing charges in other areas if only a small number of charges or providers submitting charges have been submitted in that particular geographic area.  These statements, as disseminated to Plaintiff and the Class on CIGNA's Internet website (which uses interstate wire facilities) were false.

112. As demonstrated by the foregoing allegations, CIGNA, in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S. Mail and interstate wire facilities to further all aspects of the intentional underpayment to Plaintiff and the Class by delivering and/or receiving materials necessary to carry out the scheme to defraud Plaintiff and the Class.

113. CIGNA's representations were knowingly false and misleading. CIGNA knew and recklessly disregarded that its methodology for establishing out-of-network UCR amounts, which was to rely primarily on Ingenix's databases, was inherently flawed; that Ingenix's databases were incapable of accurately calculating UCR levels; and that CIGNA did not have a valid basis upon which to represent that the bills submitted by out-of-network non-MD health care providers' were "greater than the reasonable and customary charge" or the "prevailing charge level" for the relevant services in a particular geographic area.

114. Despite its mutual knowledge that the Ingenix data did not accurately determine UCR amounts, CIGNA both defended the Ingenix data when questioned about UCR determinations based on it and by agreement relied on Ingenix to provide detailed "support" so it could defend its use of Ingenix data. Ingenix promised to supply witnesses in court if CIGNA's use of Ingenix data were challenged. In the course of appeals and other questions from CIGNA's insureds, Ingenix provided graphs and other details, vouching for the accuracy and legitimacy of its data. CIGNA then used the detail from Ingenix to vouch for the Ingenix data to the CIGNA insured or provider who was questioning UCR amounts.

115. The foregoing communications, sent via U.S. Mail and interstate wire facilities, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR amount determinations, and/or otherwise were incident to an essential part of CIGNA's scheme to defraud Plaintiff and the Class described in this Complaint. Further, CIGNA used these written communications to provide an appearance of legitimacy and regularity, and/or postpone ultimate discovery and

complaint of its underpayment scheme for out-of-network services, thereby making their discovery less likely than if such mailings or wire transmission had taken place.

116. As named fiduciaries and claims administrators of various of the CIGNA plans, CIGNA occupied and occupies a position of trust and it had, and has, a special relationship with its insureds, and therefore with Plaintiff and the Class, that requires it to accurately represent the terms and conditions of its health plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

117. Each use of the U.S. Mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

118. The above-described acts of mail and wire fraud are related because they each involve common members, common out-of-network claim practices, common results impacting upon common victims, and are continuous because they occurred over several years, and constitute the usual practice of CIGNA and the Enterprise, such that they amount to and pose a threat of continued racketeering activity.

119. If CIGNA had not participated in the conduct of the Enterprise, CIGNA could not have saved the millions of dollars it did by using the Ingenix databases for making UCR determinations even though it knew that they were flawed and invalid. By using the Ingenix database for making its UCR determinations, misrepresenting them, through use of the U.S. mail and interstate wire facilities, as providing a valid and unassailable basis for such decisions, and deterring its insureds from challenging or otherwise raising questions over how it set UCR amounts, CIGNA was able to

benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix and UnitedHealthcare.

120. CIGNA issued false and misleading letters to providers regarding benefits, as well as false and misleading EOBs and Explanations of Payment. CIGNA made out-of-network benefit reductions that were contrary to the law. CIGNA knew that the data it contributed to Ingenix was inadequate and lacked required data fields essential for Ingenix to evaluate the data and include (or exclude) it in final UCR fee schedules, but CIGNA continued to use the Ingenix databases to make UCR determinations anyway.

121. In furtherance of its underpayment scheme for out-of-network services, CIGNA, in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S. mail and interstate wire facilities to further all aspects of the intentional underpayment to Plaintiff and the Class by delivering and/or receiving materials necessary to carry out the scheme to defraud Plaintiff and the Class.

122. The direct and intended victims of the pattern of racketeering activity described herein are Plaintiff and the Class, whom CIGNA has underpaid for out-of-network services.

123. Plaintiff and the Class were injured by reason of CIGNA's RICO violations because they were underpaid for services rendered to CIGNA's insureds and were forced to exhaust significant time and resources addressing CIGNA's wrongful practices. CIGNA further deprived Plaintiff and the Class of the knowledge necessary to adequately challenge the underpayments. Their injuries were proximately caused by CIGNA's violations of 18 U.S.C. § 1962(c) because they were the

foreseeable, direct, intended and natural consequence of CIGNA's RICO violations (and commission of underlying predicate acts) and, but for CIGNA's RICO violations (and commission of underlying predicate acts), Plaintiff and the Class would not have suffered these injuries.

124. Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiff and the Class are entitled to recover threefold their damages, costs and attorneys' fees from CIGNA and other appropriate relief.

### COUNT THREE

### (Breach of Fiduciary Duties of Loyalty & Due Care In Violation of ERISA § 404)

125. Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

126. This claim is asserted by Plaintiff on her own behalf and on behalf of the Sub-Class Members.

127. Plaintiff and the Sub-Class have standing to pursue these claims because they are the assignees of their patients' out-of-network benefits claims to CIGNA.

128. Pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, CIGNA acted and continues to act as a fiduciary of its insureds' health plans, as well as a fiduciary for self-insured plans, by, *inter alia*, deciding final appeals.

129. In its role as a fiduciary, CIGNA owes Plaintiff and the Class a duty of care that requires it to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character. In this role, CIGNA must also ensure that it complies with the documents and instruments governing its plan(s), in accordance with § 404(a)(l)(B) and (D) of ERISA, 29 U.S.C.

§ 1104(a)(l)(B) and (D).  CIGNA failed to do so, and has violated its fiduciary duty of care to its insureds.

130. As a fiduciary of health plans under ERISA, CIGNA also had a duty of loyalty to Plaintiff and the Class, which required it to make decisions in the interest of its insureds, not itself, and to avoid self-dealing or financial arrangements that would benefit CIGNA at the expense of its insureds, in accordance with § 406 of ERISA, 29 U.S.C. § 1106.  CIGNA therefore could not make health care benefit decisions to save money at the expense of its insureds.

131. Nevertheless, CIGNA violated its fiduciary duty of loyalty by, *inter alia,* using the Ingenix database, during the Class Period, to benefit itself at the expense of its insureds and in a manner contrary to its contractual obligations.  CIGNA further violated this duty by not disclosing material information to its insureds, such as, *inter alia*, that it was determining UCR rates using the flawed Ingenix databases.  As the largest data contributor to Ingenix databases, CIGNA knew many of the flaws, outlined above, that made that data improper for establishing UCR amounts.

132. CIGNA used the U.S. mail and interstate wire, during the Class Period, to make representations, *inter alia*, about Ingenix's databases that it knew were false.

133. Plaintiff and the Class may assert a claim for relief for CIGNA's violation of its fiduciary duties under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), including declaratory relief, and may seek removal of any fiduciary that breached its duties.

# COUNT FOUR

## (Violations of § 664 of RICO)

134. Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

135. This claim is asserted by Plaintiff on her own behalf and on behalf the members of the Sub-Class described above.

136. Plaintiff and the Sub-Class have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party beneficiaries of their patients' out-of-network benefits.

137. Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under ... [§] 664 (relating to embezzlement from pension and welfare funds)." 18 U.S.C. § 1961(l)(B). Section 664 of Title 18 provides:

> **Theft or embezzlement from employee benefit plan**
>
> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

138. Each of the CIGNA health care plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and otherwise is subject to "any provision" of Title I of ERISA is included in this Count.

139. Each of the CIGNA health care plans that is subject to ERISA or is a non-ERISA plan funded by insurance coverage CIGNA provides or administers, is subject to Section 664 of Title 18. The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they

expressly guarantee are plan assets.

140. The governing plan documents warrant that all benefits due under the plans will be paid. By improperly reducing payments on out-of-network claims, CIGNA intentionally caused Plaintiff and the members of the Sub-Class to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of CIGNA's group health plans.

141. For fully insured health care plans, in which CIGNA both administered the plans and paid the benefits from its own assets, CIGNA benefited from the conversion of assets from its ERISA plans. Whereas these assets should have been held by CIGNA in its fiduciary capacity under ERISA and non-ERISA plans and paid to its insureds, CIGNA improperly withheld such funds and maintained them as part of its own assets for CIGNA's own benefit. For self-funded health care plans, CIGNA made final appeal decisions and intentionally caused underpayment of benefits to Plaintiff and the Sub-Class in order to justify its receipt of administrative fees. Ingenix benefited indirectly through the savings generated by its parent, UnitedHealthcare, and directly through the licensing fees it received from CIGNA and other insurers who used the flawed Ingenix databases to commit RICO violations.

142. Defendants acted with specific intent to deprive Plaintiff and Sub-Class Members of guaranteed benefits, and were sufficiently aware of the facts to know that they were acting unlawfully and contrary to the trust placed in them by Plaintiffs, Sub-Class Members and the insureds whose plans they were administering.

143. Each false payment on a claim constituted a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds

specifically earmarked within the applicable plan as a guaranteed benefit for the intended insured, for CIGNA's direct or indirect benefit.

144. As set forth above, CIGNA engaged in multiple and multi-faceted schemes, including use of the Ingenix database, to make improperly reduced payments for out-of-network services.

145. In furtherance of its false payment schemes, CIGNA, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. mail and interstate wire facilities to advance all aspects of the false payment schemes by delivering and/or receiving materials, including plan documents, insurance policies, summary plan descriptions, certificates of coverage, claim forms, reimbursement checks, EOBs describing UCR determinations, appeal determinations, overpayment actions, pre-authorization decisions, referrals to collection agencies, representations to regulators, and other materials necessary to effectuate the false payment schemes, as well as to contribute, edit and manipulate the source data for the Ingenix databases.

146. The foregoing mail communications and wire communications contained false and fraudulent misrepresentations and omissions of material facts, and otherwise were incident to an essential part of the false payment schemes and were used to provide the false payment schemes with an appearance of legitimacy and regularity, and postpone ultimate discovery and complaints of the false payment schemes, and thereby make the discovery of the false payment schemes less likely than if no such mailings or wire transmissions had taken place, and had the design and effect of preventing a meaningful evaluation and review of CIGNA's out-of-network pricing methods.

147. As named fiduciaries and claims administrators of various of the CIGNA health care plans, CIGNA occupied and occupies a position of trust and it had, and has, a special relationship with Plaintiff and Sub-Class Members that requires it to accurately represent the terms and conditions of the CIGNA health care plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

148. Each such use of the U.S. mail and interstate wire facilities constitutes a separate and distinct predicate act of "racketeering activity."

149. The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of CIGNA such that they amount to and pose a threat of continued racketeering activity.

150. The purpose of CIGNA's false payment scheme was to underpay the guaranteed benefits that were assigned to Plaintiff and Sub-Class Members, and convert those withheld funds for its own direct or indirect financial gain. CIGNA created an appearance of regularity and legitimacy by providing false and incomplete information to Plaintiff and Sub-Class Members to increase revenue through its plan and claims administration business.

151. The direct and intended victims of this pattern of racketeering activity are Plaintiff and Sub-Class Members, who CIGNA deprived of the complete guaranteed benefits to which they were entitled for their out-of-network services.

152. Defendants' RICO violations injured Plaintiff and Sub-Class Members by depriving them of hundreds of millions of dollars in guaranteed benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to challenge false and manipulative UCR determinations. Plaintiff's and the Sub-Class' injuries were proximately caused by CIGNA's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and the natural consequence of CIGNA's RICO violations (and commission of underlying predicate acts), and but for Defendants' RICO violations (and commission of underlying predicate acts), Plaintiff and Sub-Class Members would not have suffered the injuries suffered by them.

153. As a result of its misconduct, CIGNA is liable to Plaintiff and the Sub-Class in an amount to be determined at trial. Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiff and Sub-Class Members are entitled to recover threefold their damages, as well as costs and attorneys' fees from CIGNA.

## COUNT FIVE

### (Violations of The Sherman Act § 1)

154. Plaintiff hereby incorporates by reference each of the preceding paragraphs as though fully set forth herein.

155. This claim is asserted by Plaintiff on her own behalf and on behalf of the Class Members.

156. Plaintiff and the Class have standing to pursue these claims because they are the assignees of their patients' out-of-network CIGNA benefits claims.

157. CIGNA, Ingenix and other unnamed co-conspirators unlawfully restrain

competition by, *inter alia*, fixing the price of UCR rates for out-of-network services well below the level that would exist in a truly competitive market; agreeing to universally set the UCR amount based upon Ingenix's faulty databases;     and

pressuring out-of-network non-MD providers to join their networks by uniformly failing to pay competitive market rates for out-of-network services.

158. CIGNA and Ingenix have combined, conspired and/or agreed with one another, and/or with unnamed co-conspirators, to unreasonably restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. CIGNA combined, conspired and/or agreed with its co-conspirators to artificially lower, fix or maintain the UCR amounts it paid to Plaintiff and the Class, which constitutes a horizontal price fixing conspiracy that is a *per se* violation of the Sherman Act.

159. More specifically, CIGNA reached agreement with its competitors, including UnitedHealthcare, CIGNA, and/or a number of other non-parties to determine the UCR using primarily the Ingenix Database, as described above.

160. UnitedHealthcare acts through its alter ego Ingenix to facilitate the direct horizontal agreements for compiling and sharing competitive information and UCR rate data among all the conspirators, including CIGNA.

161. CIGNA and other data contributors to Ingenix are entitled to "free" use of the Ingenix databases simply for continuing to submit data at the level which they submitted data when the database was owned by HIAA.

162. CIGNA engaged in price fixing when it agreed with its competitors, including UnitedHealthcare, to utilize the same database to determine the UCR rates for health care services, which lead to them paying substantially the same reduced

rates for services rendered to their insureds.

163. Typical examples of price fixing agreements include those that adopt a standard formula for computing prices and/or adhere to a minimum fee or price schedule. CIGNA did both.

164. CIGNA along with its co-conspirators adopted a standard formula for making UCR determinations, and each has agreed to a method of determining the maximum price or fee, via the Ingenix database, that it will pay for out-of-network charges. This alone amounts to a naked agreement to fix prices.

165. CIGNA's agreement gives it, collectively with its competitors, tremendous market power to set UCR at rates well below those which would exist in a competitive marketplace. In fact, no competitive pressure to raise UCR rates exists while all the conspirators act collectively to reduce prices. Without agreement and collective action between them, including the exchange and compilation of relevant pricing data, CIGNA would be unable to systematically and across the board reduce the UCR rates paid.

166. In addition to agreeing to price their UCR rates using the exact same databases, the insurers also engage in exactly parallel behavior. They have substantially similar contracts with their customers; they submit UCR rate data to the databases that they know skew the relevant UCR determinations downward; and they all utilize Ingenix databases to determine UCR rates. These parallel behaviors allow their price fixing agreement to effectively depress the UCR rate paid to providers for services rendered to their insureds, and otherwise reduce competition among would-be competitors.

167. The market is ripe for collusion, conspiracy and agreement as it is heavily concentrated, with a relatively standardized product, with numerous opportunities for the CIGNA and its co-conspirators to agree and collude, including involvement and participation in the same trade associations, and availability of the same Ingenix Databases. Additionally, because pricing information is shared among the parties, defection from the agreement is easy to detect.

168. There is virtually no incentive for CIGNA, or its co-conspirators, to compete in setting the out-of-network UCR rate. To the contrary, each conspirator benefits from reduced UCR reimbursement costs made possible by their agreement without affecting their ability to compete for customers.

169. In fact, the agreement to use the Ingenix databases for UCR determinations allows all co-conspirators to enjoy the monopoly or near monopoly status that CIGNA and some of its co-conspirators experience in certain markets due to the use of data skewed by use of the in-network negotiated charge data used in those areas.

170. CIGNA and its co-conspirators further benefit from their agreement to fix and suppress prices because the depressed UCR rates incentivizes providers to become members of their various "networks," where further cost reducing measures and other methods of control can be placed on them.

171. A market with the characteristics described above facilitates collusion and agreement to fix prices, and detection and discipline are also easy to maintain.

172. CIGNA's agreement with its competitors to use the Ingenix databases to determine UCR amounts enabled CIGNA to impose artificially low UCR rates and

other anticompetitive restrictions on Plaintiff and the Class that could not exist in a competitive market.

173. Competition between the payors also has been reduced by the agreement to improperly reduce UCR amounts.

174. Without the agreement to fix UCR rates and reduce competition among payors, Plaintiff and the Class would be paid more for the health care services they rendered to CIGNA's insureds.

175. Nearly every major insurer uses Ingenix's databases, making it nearly impossible for providers not to be affected by CIGNA's and its co-conspirators' agreement to use the Ingenix data to fix prices and not compete. As a result, CIGNA and its co-conspirators are able to control the market in a way that reduces their costs at the expense of out-of-network non-MD health care providers to whom they pay only a fraction of what they are owed or the market demands. Because of this "price fixing" scheme, CIGNA has paid less money to Plaintiff and the Class for their out-of-network services than they should have in a competitive market absent such a scheme.

176. CIGNA's activities, including the administration and operation of health care plans in every state in the United States, are in the regular, continuous and substantial flow of interstate commerce, and have a substantial effect upon interstate commerce.

177. CIGNA's unlawful activities, concerted actions, conspiracy to restrain trade, and agreement to fix prices substantially affect and restrain the operation of interstate commerce.

178. Out-of-network health care services are the relevant products and/or

services market affected by CIGNA's conduct.

179. The United States of America is the relevant geographic market.

180. As a result of the foregoing agreement or conspiracy, CIGNA has caused Plaintiff and the Class to suffer financial loss due to the fact that CIGNA pays them UCR rates that are unconscionably low and at noncompetitive levels.

181. Plaintiff and the Class are entitled to damages under 15 U.S.C. § 15, *et seq.*, in an amount to be determined at trial, trebled, plus their costs, expenses and attorneys' fees. Plaintiff and the Class further seek injunctive relief in the form of order prohibiting CIGNA from engaging in the unlawful behavior described herein.

## IX. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, individually and on behalf of the Class, prays for judgment against CIGNA and in their favor as follows:

A. Certifying the Class as set forth in this Complaint, and appointing Plaintiff as Class representative for these classes;

B. Declaring that CIGNA has breached the terms of its members' plans with regard to out-of-network benefits in its members' health plans, and thereby awarding damages to Plaintiff and the Class for unpaid benefits in ERISA plans, as well as awarding declaratory relief with respect to CIGNA's violations of ERISA;

C. Declaring that CIGNA is liable to Plaintiff and the Class pursuant to RICO, 18 U.S.C. §§, 1962(a) and (c), 1964(c) for threefold their damages, costs and attorney fees;

D. Enjoining CIGNA from committing the RICO violations described above in the future and/or declaring their invalidity;

E.     Preliminarily and permanently enjoining CIGNA from using the Ingenix databases, or from making UCR determinations in the absence of valid and reliable data substantiating the lesser-adjudicated claims amounts;

F.     Preliminarily and permanently enjoining CIGNA from using or causing others to use outdated Ingenix data in connection with payment of out-of-network benefit claims by CIGNA members;

G.     Preliminarily and permanently enjoining CIGNA from applying out-of-network adverse benefit determinations where its insureds' Evidences of Coverage and group health plan summary documents do not disclose or authorize them;

H.     Preliminarily and permanently enjoining CIGNA from discouraging appeals and/or deciding appeals in a manner inconsistent with federal and state law;

I.     Preliminary and permanent enjoining CIGNA from discouraging out-of-network care or placing undisclosed obstacles in the path of CIGNA members seeking to access out-of-network care;

J.     Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable counsel fees, costs and expenses in amounts to be determined by the Court;

K.     Awarding interest from date of initial out-of-network adverse benefit determinations on all unpaid amounts;

L.     Awarding prejudgment interest; and

M.     Granting such other and further relief as is just and proper.

## X.     JURY TRIAL DEMAND

182. Plaintiff hereby requests a jury trial for all claims so triable.

DATED: April 17, 2009

**LITE, DePALMA, GREENBERG
  & RIVAS, LLC**

 s/Bruce D. Greenberg             
Bruce D. Greenberg
Jennifer Sarnelli
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
E-mail bgreenberg@ldgrlaw.com
Telephone:  (973) 623-3000


**BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.**
Andrew S. Friedman
Elaine A. Ryan
Kathryn A. Jann
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
E-mail afriedman@bffb.com
Telephone:  (602) 274-1100

*Attorneys for Plaintiff*